**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

JACQUELINE M. SPENCER,

    Plaintiff,

v.                                                      Case No. 6:15-cv-345-Orl-37TBS

CITY OF ORLANDO, FLORIDA;
MICHAEL ZAMBITO; and PAUL
EVANCOE,

    Defendants.

**ORDER**

This cause is before the Court on the following:

1. Defendants City of Orlando, Michael Zambito[,] and Paul Evancoe's Motion for Summary Judgment (Doc. 23), filed March 1, 2016;

2. Plaintiff's Response to Defendants City of Orlando, Michael Zambito, and Paul Evancoe's Motion for Summary Judgment and Memorandum of Law in Support (Doc. 26), filed April 11, 2016;

3. Defendants' Reply to Plaintiff's Response to Motion for Summary Judgment (Doc. 28), filed April 12, 2016; and

4. Plaintiff's Sur-Reply to Defendants Orlando, Michael Zambito, and Paul Evancoe's Reply to Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment and Memorandum of Law in Support (Doc. 33), filed May 1, 2016.

Jacqueline Spencer ("**Plaintiff**") initiated this action on behalf of herself and her late son, Marquis Spencer, pursuant to 42 U.S.C. § 1983 and Florida's wrongful death statute. (Doc. 1.) Upon consideration, the Court finds that Defendant Officers Michael Zambito ("**Zambito**") and Paul Evancoe ("**Evancoe**") and the City of Orlando ("**City**") are entitled to judgment as a matter of law.

## BACKGROUND[1]

On the evening of May 3, 2013, Orlando Police Department ("**OPD**") officers Zambito and Evancoe were working with the Tactical Anti-Crime squad in an undercover Ford Explorer ("**Explorer**") in the area of Kirkman and Raleigh Street in Orlando, Florida ("**Area**"). (Doc. 23-1, ¶¶ 3–4; Doc. 23-2, pp 3–4.) While conducting surveillance in the Area, Evancoe observed three African-American males ("**Males**") pull into a 7-11 parking lot in a blue Hyundai ("**Hyundai**").[2] (Doc. 23-2, p.4.) The Males were later identified as Marquis Spencer ("**Decedent**"), Ronmono Carson ("**Carson**"), Aaron Beavers ("**Beavers**"). According to Evancoe and Zambito (collectively, the "**Defendant Officers**"), the Males were acting suspiciously, so the Defendant Officers decided that they would "wait for [the Males] to leave the gas station, [] stop them, [and] see what [the Males were] up to." (*Id.* at 4–5.) In the meantime, Evancoe called for backup, and OPD Officer Elio Florin ("**Florin**") and his partner ("**Bigelow**") responded to the call. (*Id.* at 5.)

Once the Males returned to their car and exited the parking lot, Evancoe observed

---

[1] The Court construes the facts in the light most favorable to Plaintiff, the non-moving party. *See Battle v. Bd. of Regents*, 468 F.3d 755, 759 (11th Cir. 2006); *see also Robinson v. Arrugueta*, 415 F.3d 1252, 1257 (11th Cir. 2005) ("When conducting a qualified immunity analysis, district courts must take the facts in the light most favorable to the party asserting the injury," such that the Court "has the plaintiff's best case before it.").

[2] The Hyundai's windows were not tinted. (Doc. 27-1, p. 21.)

2

the following violations of Florida law: (1) the Males did not put on their seatbelts;[3] and (2) Decedent, the driver, did not come to a complete stop when exiting the parking lot. (*Id.*; Doc. 23-1, ¶¶ 6–7.) Consequently, as Decedent turned southbound onto Kirkman Road, Zambito activated the emergency lights on the Explorer and initiated a traffic stop of the Hyundai in the turn lane at the intersection of Kirkman Road and Raleigh Street.[4] (Doc. 23-1, ¶ 8; Doc. 23-2, p. 5.) Zambito positioned the Explorer "closely behind" the Hyundai and Florin positioned his vehicle in front of the Hyundai, essentially creating a "soft block" on the Hyundai ("**First Stop**"). (Doc. 23-1, ¶ 9; Doc. 23-2, p. 21; Doc. 23-3, p. 13; *see also* Doc. 27-1, p. 11.)

Evancoe exited the Explorer with a flashlight in his hand and a gun in his holster. (Doc. 23-2, p. 11.) He was wearing a vest that said "police" in white letters. (*Id.*) As Evancoe approached the passenger side of the Hyundai, Decedent reversed the Hyundai towards Evancoe, hit the Explorer, and maneuvered around Florin's vehicle to turn right onto Raleigh Street.[5] (Doc. 23-1, ¶¶ 11–12; Doc. 23-2, p. 6; Doc. 23-3, pp. 4, 7–8;

---

[3] Carson testified that he did not recall whether the Males put their seatbelts on. (Doc. 27-1, p. 22.)

[4] The constitutional reasonableness of a traffic stop does not depend on the actual motivations of the individual officers involved, so long as they had probable cause to conduct the traffic stop. *Whren v. United States*, 517 U.S. 806, 813 (1996).

[5] Although the Males did not *immediately* recognize that the Defendant Officers were attempting to stop them (*see* Doc. 27-1, p. 9), Carson's testimony is inconsistent in regards to when the Males realized that they were being stopped. On two occasions, Carson says that Decedent continued to turn onto Raleigh Street because Defendant Officers "put the lights on before [they] got to the Hyundai," so the Males did not "know [the police] was [sic] for [them]." (*See id.* at 11; *see also id.* at 9.) At two other points in his deposition, however, Carson testified that the Males knew the Defendant Officers were "on [them]" by the time they had stopped before turning onto Raleigh Street, but Decedent maneuvered around Florin's vehicle to turn onto Raleigh Street rather than stopping. (*Id.* at 9, 11–12.)

In any event, it is undisputed that, by the time Decedent turned onto Raleigh Street, the Males knew that there was a police car with its lights on behind them and that Evancoe

3

Doc. 27-1, p. 12.) Evancoe returned to the Explorer, and Zambito and Florin engaged in the pursuit of the Hyundai. (Doc. 23-1, ¶ 13; Doc. 23-2, p. 21; Doc. 27-1, p. 13.) At the intersection of Raleigh Street and Resource Avenue, Zambito hit the rear of the Hyundai with the Explorer, causing the Hyundai to lose traction and hit Florin's vehicle, which by that time was positioned slightly perpendicular to the front of the Hyundai. (Doc. 23-1, ¶¶ 13–14; Doc. 23-2, p. 21; Doc. 23-3, p. 16; Doc. 27-1, p. 15; *see also* Doc. 23-2, pp. 13–14.) At this point, the Hyundai was "pinned" between the Explorer and Florin's vehicle, and all three vehicles were stopped ("**Second Stop**"). (Doc. 23-1, ¶¶ 14–15.)

Immediately: (1) Evancoe exited the passenger side of the Explorer and moved toward the passenger side of the Hyundai; (2) Florin exited his vehicle; and (3) Carson fled from the Hyundai with a gun. (*Id.* ¶ 15; Doc. 23-2, pp. 14–15, 21; Doc. 23-3, pp. 4, 8; Doc. 27-1, pp. 16, 19.) As Florin attempted to exit his vehicle, Zambito heard the Hyundai's engine rev and saw the Hyundai move towards Florin. (Doc. 23-1, ¶ 15; *see also* Doc. 23-2, p. 21.) After losing sight of Florin and hearing the Hyundai engine rev again, Zambito "fired several rounds … to prevent Florin from being killed." (Doc. 23-1, ¶¶ 17–18.) Evancoe heard the gunshots and saw Carson running from the Hyundai with a gun in his hand. (Doc. 23-2, pp. 7, 15–16.)

Evancoe then approached the driver side of the Hyundai, saw Decedent sitting in the driver seat with his left hand on the wheel and his right hand out of sight, and ordered Decedent not to move. (*Id.* at 7, 17–18.) Nevertheless, Decedent lowered his hands off of the steering wheel, prompting Evancoe to fire six shots toward Decedent. (*Id.* at 7–8, 18.) "[A]lmost immediately after," Evancoe heard another round of gunshots between

---

had exited the Explorer. (*See id.* at 9–13.)

Bigelow and Carson—Bigelow shot Carson once from behind. (*Id.* at 19; Doc. 27-1, pp. 25, 28.)

Evancoe instructed Beavers—who was in the backseat—to exit the Hyundai, and he obliged. (Doc. 23-2, p. 8.) Evancoe and other OPD officers extracted Decedent from the car and initiated chest compressions, but Decedent died on the scene. (*Id.* at 9.) A subsequent search of the Hyundai revealed an additional loaded gun in the glove box. (Doc. 23-4, p. 2.)

On March 5, 2015, Plaintiff filed a six-count Complaint pursuant to 42 U.S.C. § 1983 and Florida law, alleging that: (1) Defendant Officers violated Decedent's constitutional right to be free from excessive force; (2) Defendant Officers are liable for the wrongful death of Decedent; and (3) the City's policies, customs, or procedures were a cause of the Decedent's death. (Doc. 1.) On March 1, 2016, Defendants moved for summary judgment, arguing that: (1) Defendant Officers did not use excessive force and are entitled to qualified immunity; and (2) there is no evidence of a custom or policy to establish the City's liability ("**Motion**"). (Doc. 23.) The Motion has been fully briefed (*see* Docs. 23, 26, 28, 33) and is ripe for adjudication.

## STANDARDS

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). As to issues for which the movant would bear the burden of proof at trial, the "movant must affirmatively show the absence of a genuine issue of material fact, and support its motion with credible evidence demonstrating that no reasonable jury could find for the

non-moving party on all of the essential elements of its case." *Landolfi v. City of Melbourne, Fla.*, 515 F. App'x 832, 834 (11th Cir. 2012) (citing *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993)).  As to issues for which the non-movant would bear the burden of proof at trial, the movant has two options: (1) the movant may simply point out an absence of evidence to support the non-moving party's case; or (2) the movant may provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *United States v. Four Parcels of Real Prop. in Green & Tuscaloosa Ctys.*, 941 F.2d 1428, 1438 (11th Cir. 1991) (citing *Celotex Corp.*, 477 U.S. at 325).

"The burden then shifts to the non-moving party, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact exists." *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006) (citing *Fitzpatrick*, 2 F.2d at 1115–17). "A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Four Parcels*, 941 F.2d at 1437 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The Court must view the evidence and all reasonable inferences drawn from the evidence in the light most favorable to the non-movant. *Battle v. Bd. of Regents*, 468 F.3d 755, 759 (11th Cir. 2006). However, "[a] court need not permit a case to go to a jury . . . when the inferences that are drawn from the evidence, and upon which the non-movant relies, are 'implausible.'" *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 743 (11th Cir. 1996).

**DISCUSSION**

Defendant Officers provide minimal record evidence to justify their actions and authority in support of their position. (*See* Doc. 23.) Unfortunately, Plaintiff has done even less. (*See* Doc. 26.) Plaintiff's only evidence is in the form of unsworn deposition testimony by Carson, which paints a weak picture—at best—of the events leading up to the Decedent's death.[6] (*See* Doc. 27-1.) Indeed, Carson's testimony is inconsistent, valueless in regards to the actual shooting of Decedent, and ultimately fails to establish any genuine disputes of material fact. (*See id.*) Thus, while the Court is deeply troubled by the decision of these Defendant officers to turn a traffic stop for suspicious activity into a shooting death, that 20/20 hindsight from the comfort of chambers is insufficient to overcome the constraints of binding precedent. Defendants are entitled to judgment as a matter of law.[7]

### I.   Section 1983 Claims Against the Defendant Officers

---

[6] From the record, the Court discerns that Carson was late to his deposition and that defense counsel—Mr. Moore—was the only person present when he arrived. (*See* Doc. 31.) Mr. Moore called Plaintiff's counsel to return and, when he did, Mr. Moore initiated the deposition. (*Id.* at 4.) Mr. Moore never notified Plaintiff's counsel that Carson had not been sworn. (*Id.*)

Defendants now argue that Carson's unsworn deposition testimony cannot alone defeat a motion for summary judgment. (Doc. 28, pp. 2–3.) The Court does not countenance this "gotcha" tactic. As counsel who noticed the deposition (*see* Doc. 33-1) and who reinitiated the deposition upon Carson's arrival, Mr. Moore had a professional duty to advise Plaintiff's counsel that Carson had not been sworn. Moreover, Mr. Moore conducted the direct examination of Carson and had an opportunity to cross-examine him during the deposition. (*See* Doc. 27-1.) As such, the Court considers Carson's unsworn testimony.

[7] The Court is equally troubled by the briefings submitted by counsel for both parties. Far from models of clarity, the briefs lack pinpoint citations, include little to no authority in support of the parties' respective positions, provide superficial treatment of the issues, and generally fail to comply with the standards expected of competent counsel.

Counts II and III of the Complaint assert claims against Zambito and Evancoe, respectively, pursuant to § 1983 for their alleged use of excessive force. Defendant Officers move for summary judgment as to these claims on the ground that they are entitled to qualified immunity. (Doc. 23, pp. 7–17.)

Section 1983 provides aggrieved persons with a procedural mechanism to seek redress for constitutional violations that are committed while a defendant is acting under color of state law. 42 U.S.C. § 1983. Acts performed by law enforcement officers—even if illegal or unauthorized—are considered to have been performed under color of state law so long as the acts are done in the defendant's capacity as a law enforcement officer. *See West v. Atkins*, 487 U.S. 42, 49–50 (1988). To avoid an individual liability claim under § 1983, law enforcement officers may invoke the defense of qualified immunity, which protects "all but the plainly incompetent or one who is knowingly violating federal law." *See Depalis-Lachaud v. Noel*, 505 F. App'x 864, 867 (11th Cir. 2013). Qualified immunity is a question of law to be decided by the Court, and it is evaluated under an "objective-reasonableness" standard. *Courson v. McMillian*, 939 F.2d 1479, 1486–87 (11th Cir. 1991).

"In order to receive qualified immunity, the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002). Here, this element is undisputed. Therefore, the burden shifts to Plaintiff to show that qualified immunity is not appropriate. *Id.*; *see also Terrell v. Smith*, 668 F.3d 1244, 1250 (11th Cir. 2012). To do so, Plaintiff must establish that: (1) Defendant Officers violated Decedent's constitutional right; and (2) the illegality of their conduct "was clearly established" on the date of the

incident—May 3, 2013. *See Terrell*, 668 F.3d at 1250; *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). While the Court may address the prongs of the qualified immunity inquiry in any order, *Pearson*, 555 U.S. at 236, here, the Court begins *and ends* its analysis with the first prong, finding that Defendant Officers did not violate Decedent's constitutional rights.

In § 1983 excessive force cases such as the one before the Court today, "the question is whether the officers' actions [were] 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Carr v. Tatangelo*, 338 F. 3d 1259, 1267 (11th Cir. 2003) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. The Court should consider the facts and circumstances of each case and balance the level of force used against: (1) the severity of the crime at issue; (2) the immediacy of the threat posed by the suspect to the safety of the officers or others; and (3) the suspect's efforts, if any, to actively resist arrest or evade arrest by flight. *Id.*

The United States Supreme Court has recognized that "it is constitutionally permissible for an officer to use deadly force when 'the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others.'" *Carr*, 338 F.3d at 1268 (quoting *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)).

> Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

*Garner*, 471 U.S. at 11–12. "A reasonable but mistaken belief that probable cause exists for using deadly force is not actionable under § 1983." *Carr*, 338 F.3d at 1269.

The U.S. Court of Appeals for the Eleventh Circuit has "consistently upheld an officer's use of force and granted qualified immunity in cases where the decedent used or threatened to use his car as a weapon to endanger officers or civilians immediately preceding the officer's use of deadly force." *McCullough v. Antolini*, 559 F.3d 1201, 1208 (11th Cir. 2009) (examining several cases). Indeed: (1) a suspect's "aggressive use of [an] automobile during [a] chase" may create probable cause for officers to believe that the suspect "committed a felony involving the threatened infliction of serious physical harm"; and (2) the manner in which a suspect uses his automobile may "give reasonable policemen probable cause to believe that [the automobile] ha[s] become a deadly weapon." *See Pace v. Capobianco*, 283 F.3d 1275, 1281–82 (11th Cir. 2002).

Here, the uncontradicted evidence reveals that Decedent evaded the First Stop (*see* Doc. 23-1, ¶¶ 11–12; Doc. 23-2, pp. 6, 13; Doc. 23-3, pp. 4, 7–8, 16; Doc. 27-1, pp. 11, 14) and used the Hyundai to hit the Explorer and threaten injury to Evancoe and Florin during the First and Second Stops (*see* Doc. 23-1, ¶ 11, 15–16; Doc. 23-2, pp. 6, 13, 21; Doc. 23-3, pp. 4, 7).[8] This behavior was sufficient to give Defendant Officers a reasonable belief that Decedent: (1) was attempting to flee; (2) was using the car as a deadly weapon—particularly during the Second Stop; (3) posed a threat to the safety of

---

[8] Even if the Court were to accept Carson's inconsistent testimony that Decedent did not realize that he was the one being stopped, Carson's testimony did not contradict the defense evidence that Decedent backed into the Explorer during the First Stop prior to turning onto Raleigh Street. (*See* Doc. 27-1.) Thus, there is no genuine dispute that Decedent backed into the Explorer before fleeing the First Stop. *See Mize*, 93 F.3d at 742 ("For factual issues to be considered genuine, they must have a real basis in the record.").

the officers involved; and (4) had committed a crime involving the infliction of serious physical harm.[9] Ergo, both Defendant Officers were entitled to use deadly force. *McCullough*, 559 F.3d at 1208 (finding that officers were entitled to use deadly force against a suspect whom they believed to pose a serious threat of physical harm or death by using his vehicle in a "dangerous and aggressive manner"); *see also Robinson*, 415 F.3d at 1256 ("Even if in hindsight the facts show that [the defendant officer] perhaps could have escaped unharmed, we conclude that a reasonable officer could have perceived that [the suspect] was using [his car] as a deadly weapon. [Thus,] [the defendant officer] has probable cause to believe that [the suspect] posed a threat of serious physical harm.").

Moreover, the law does not require that Defendant Officers wait to use deadly force. *See Long v. Slaton*, 508 F.3d 576, 581 (11th Cir. 2007) ("Even if we accept that the threat posed by [the suspect] to [the officer] was not immediate in that the cruiser was not moving toward [the officer] when shots were fired, the law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect."). Nonetheless, neither Evancoe nor Zambito fired at Decedent until they believed that physical harm or death was imminent. (*See* Doc. 23-1, ¶¶ 16–18, 21; Doc. 23-2, p. 18.) Such facts further support the Court's conclusion that Defendant Officers were justified in their use of deadly force. *See Carr*, 338 F.3d at 1269 (considering that the officer "did not fire his gun until he saw [the suspect] point what he believed to be

---

[9] *See* Fla. Stat. § 784.021 (defining "aggravated assault" as "an assault with a deadly weapon without intent to kill" or "with intent to commit a felony"); Fla. Stat. § 784.07(2)(c) (enhancing aggravated assault on a law enforcement officer to a second degree felony;

a gun" towards another officer in determining that the officer's use of deadly force was justified).

The Court finds that Evancoe's use of deadly force was further justified by the fact that, right after he saw Carson flee from the Hyundai with a gun in his hand (*see* Doc. 23-2, pp. 7, Doc. 27-1, pp. 16, 19, 23, 25), Decedent disregarded his orders to remain still in the Hyundai (*see* Doc. 23-2, pp. 7–8, 17–18). *See McCullough*, 559 F.3d at 1208 (considering the suspect's failure to abide by or respond to the officer's commands); *Garczynski v. Bradshaw*, 573 F.3d 1158, 1168 (holding that "the escalation into deadly force was justified by [the suspect's] refusal to comply with the officers' commands").

Although in hindsight Defendant Officers may have taken a different course of action, the Court is bound to conclude that their conduct during this quickly evolving and rapidly escalating situation involving perceived threats of serious physical harm was not objectively unreasonable.[10] *See Carr*, 338 F.3d at 1269 (finding that the defendant officer acted in an "objectively reasonable manner to the apparent imminent threat to his fellow officer to save his life" in the "split-second, rapidly escalating situation involving perceived deadly force"); *see also McCullough*, 559 F.3d at 1208 (recognizing the deference afforded to "split-second police judgments in the field"). As such, the Court concludes that Defendant Officers did not violate Decedent's constitutional rights; they are, therefore, entitled to judgment as a matter of law on Plaintiff's § 1983 claims for excessive force.

## II.     Section 1983 Claim Against the City

The Court now turns to Defendant's Motion as it relates to Count I—Plaintiffs

---

[10] It is unclear which of Defendant Officers' gunshots caused the death of Decedent, but the outcome remains the same in either event, as both Defendant Officers were justified in their use of deadly force.

§ 1983 claim against the City. Municipal liability under § 1983 requires proof of an official policy or custom that led to the claimed injury, *see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978), which Plaintiff failed to identify or establish here (*see* Doc. 26). Regardless, in light of the Court's finding that Defendant Officers did not violate Decedent's constitutional rights, Count I must fail. *See City of L.A. v. Heller*, 475 U.S. 796, 799 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point."); *see also City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (suggesting that a city cannot be liable under § 1983 absent a constitutional violation). As such, the Court finds that the Motion is due to be granted as to Count I.

### III.   Wrongful Death Claims Against the City and Defendant Officers[11]

Counts IV, V, and VI of the Complaint assert Florida wrongful death claims against the Defendants, alleging that Defendant Officers were negligent in their use of force. The Defendants move for summary judgment as to these claims on the ground that Defendant Officers were entitled to use deadly force pursuant to Florida Statutes §§ 776.012 and 776.05. (Doc. 23, pp. 20–23.)

To begin, "[t]here is no cause of action for the negligent use of force . . . . [I]t is

---

[11] Ordinarily, the Court would decline to exercise supplemental jurisdiction over the state law claims after disposing of the federal claims. *See Mauhgon v. City of Covington*, 505 F. App'x 818, 823 (11th Cir. 2013) (citing *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 349–50 (1988) for the proposition that a district court does not abuse its discretion in declining to exercise supplemental jurisdiction over state law claims after granting summary judgment in favor of defendant as to each of the federal claims). However, because the state law claims have become time-barred during the pendency of this action, the Court must exercise its supplemental jurisdiction. *See Ingram v. School Bd. Of Miami-Dade Cty.*, 167 F. App'x 107, 109 (11th Cir. 2006).

13

inapposite to allege the negligent commission of an intentional tort, such as the use of excessive force." *Southerland v. Carey*, No. 3:11-cv-1193-J-37MCR, 2013 WL 1912716, at *6 (M.D. Fla. May 9, 2013) (quoting *Lewis v. City of W. Palm Beach*, 561 F.3d 1288, 1294 (11th Cir. 2009)). Consequently, Counts IV, V, and VI fail as a matter of law.

Further, Defendant Officers' use of force was justified pursuant to Florida Statute § 768.012(2), which provides that "[a] person is justified in using . . . deadly force if he . . . reasonably believes that using . . . such force is necessary to prevent imminent death or great bodily harm to himself . . . or another or to prevent the imminent commission of a forcible felony." Defendant Officers' reasonable belief that Decedent posed a threat of imminent death or great bodily harm to the officers involved is supported by the fact that Decedent: (1) used the Hyundai to hit the Explorer and, in the process, threatened injury to Evancoe; and (2) revved the engine in attempt to flee the Second Stop, threatening injury to Florin. (Doc. 23-1, ¶ 11, 15, 17–18; Doc. 23-2, pp. 6, 13, 21; Doc. 23-3, pp. 4, 7–8; Doc. 27-1, p. 12.) As discussed at length above, even viewed in the light most favorable to Plaintiff, the evidence reveals no genuine dispute of material fact as to whether Defendant Officers' use of deadly force was objectively reasonable; as such, Defendant Officers are immune from the wrongful death claims.[12] *See Penley v. Eslinger*, 605 F.3d 843, 855 (11th Cir. 2010); *Southerland*, 2013 WL 1912716, at *7.

## CONCLUSION

Accordingly, it is hereby **ORDERED AND ADJUDGED**:

---

[12] To the extent that Defendant Officers were required to give a warning prior to their use of force, *see, e.g.*, Fla. Stat. § 776.05(3), the Court is satisfied that the Explorer's activated emergency lights and the "pinning" of the Hyundai during the Second Stop (Doc. 23-1, ¶¶ 8–9, 14–15) were sufficient warnings prior to Defendant Officers' use of deadly force and that additional warnings were not feasible given the circumstances.

1. Defendants City of Orlando, Michael Zambito[,] and Paul Evancoe's Motion for Summary Judgment (Doc. 23) is **GRANTED**.
2. The Clerk is **DIRECTED** to enter judgment in favor of Defendants and against Plaintiff as to all Counts.
3. The Clerk is further **DIRECTED** to terminate all pending motions and deadlines and to close the case. The pretrial conference scheduled for July 21, 2016 is cancelled.

**DONE AND ORDERED** in Chambers in Orlando, Florida, on July 18, 2016.



ROY B. DALTON JR.
United States District Judge

Copies:

Counsel of Record